### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COSTAR GROUP, INC., and COSTAR REALTY INFORMATION, INC.<br><br>Plaintiffs,<br><br>v.<br><br>RE BACKOFFICE, INC.<br><br>Defendant. | Civil Action No. **2:17-01354-AJS**<br><br>**Judge Arthur J. Schwab** |

## JOINT STIPULATION FOR ENTRY OF [PROPOSED] JUDGMENT AND PERMANENT INJUNCTION

Plaintiffs CoStar Group, Inc., and CoStar Realty Information, Inc. (collectively "CoStar"), and Defendant RE BackOffice, Inc. ("REBO"), hereby stipulate to the entry of the [Proposed] Judgment and Permanent Injunction attached as Exhibit A. REBO hereby stipulates to the following facts:

1. REBO provides outsourcing services to the commercial real estate industry. One of its functions is to provide commercial real estate property research.

2. CoStar is a leading provider of commercial real estate data and photographs. It provides commercial real estate information and listing products including CoStar's subscription database, LoopNet.com, Showcase.com, and Cityfeet.com.

3. Xceligent, Inc. ("Xceligent") is a CoStar competitor. Xceligent contracted with REBO to conduct commercial real estate research on its behalf. REBO currently has an oral agreement with Xceligent.

4. REBO's operations for the Xceligent account are handled by its affiliate and agent MaxVal Technologies, Pvt., Ltd. ("MaxVal") in India. MaxVal takes direction directly from Xceligent, or from Xceligent but via REBO.

5. MaxVal's Chief Executive Officer Balbir Khera is the brother of REBO's Chief Executive Officer Harbinder Khera.

6. REBO/MaxVal has provided services to Xceligent for many years, and more or less continuously from 2012 to date. The services have been essentially consistent, with the only significant difference being the number of researchers working on the Xceligent account, which varied from time to time.

7. With respect to REBO's work for Xceligent, REBO and MaxVal held themselves out as one firm, and Xceligent dealt with REBO/MaxVal as one firm. For example, MaxVal employees working on behalf of Xceligent used @rebackoffice.com emails addresses to communicate with Xceligent and their emails contain REBO signature blocks. Furthermore, REBO invoices Xceligent for work done by MaxVal employees on REBO letterhead. Thus, REBO and MaxVal, notwithstanding their corporate forms and the details of their relationship, operates as a single entity with respect to Xceligent, and Xceligent treats REBO/MaxVal as a single entity and as the agent of Xceligent.

8. Tanvir Khan, the primary project manager, interacts with Xceligent on behalf of both REBO and MaxVal. He is REBO's principal point of contact with Xceligent for day-to-day operations. REBO bills Xceligent for Mr. Khan's time, and Mr. Kahn uses a REBO email address and holds himself out as REBO's Group Head for Market Research, even though Mr. Khan is technically employed by MaxVal.

9. Since at least 2012, Xceligent management and employees directed REBO/MaxVal to copy content, including data and flyers that included photographs, from websites owned by CoStar. These websites included loopnet.com, showcase.com and cityfeet.com. These activities were pursued despite the fact that CoStar's terms of use and the

2

relevant laws (including copyright law) prohibited competitors like Xceligent and its agents from engaging in these activities.

10. REBO's Chief Executive Officer, Harbinder Khera, recently become aware of the facts set forth herein as a result of REBO's involvement, as a subpoena recipient, in the lawsuit styled *CoStar Group, Inc., et al., v. Xceligent, Inc.*, Case No. 4:16-cv-01288 pending in the United States District Court for the Western District of Missouri. Mr. Khera's investigation into the facts herein occurred both before but predominantly after the deposition of REBO that occurred in connection with the subpoena.

11. As part of his investigation in responding to the subpoena, Mr. Khera reviewed REBO/MaxVal communications with Xceligent, and spoke with MaxVal's Chief Executive Officer, Balbir Khera, as well as Mr. Khan, the leader of the MaxVal operations team working for Xceligent.

12. In responding to the subpoena, Mr. Khera also spoke with with Xceligent management, including Xceligent's Chief Research Officer, Nathan ("Nate") Lipowicz, about some of the facts herein.

13. Xceligent's Chief Executive Officer, Doug Curry, previously visited the MaxVal operation in India to directly train the operations team. REBO's contact at Xceligent for contractual purposes and billing is Mr. Lipowicz, and he also provided instruction directly to the REBO/MaxVal operations team. REBO understands Mr. Lipowicz has a team at Xceligent that works closely and directly with the REBO/MaxVal team in India. Another key point of contact at Xceligent is Frank Bandelow. Mr. Bandelow typically issues directions on behalf of Xceligent to Tanvir Khan of the REBO/MaxVal operations team.

14. Xceligent, including senior-level managers, engages in regular oversight of the REBO/MaxVal operations team, and that team reports to Xceligent frequently and directly. Thus, Xceligent and the REBO/MaxVal operations team communicate regularly.

15. To facilitate collaboration between REBO/MaxVal and Xceligent, Xceligent created documents in Google Docs for the REBO/MaxVal team to utilize. Xceligent and REBO/MaxVal use Google Docs, as well as other online accounts such as Skype, to communicate information to each other. As Xceligent is aware, the REBO/MaxVal team also communicates with Xceligent using email. That email is stored on a Post Office Protocol ("POP") server. As Xceligent knows, and has known for several years, these communications, including those sent via email, include communications pertaining to LoopNet and CoStar and specifically the REBO/MaxVal team's copying of CoStar content from LoopNet and the circumvention of CoStar's security measures.

16. Xceligent provides REBO/MaxVal with virtual private network ("VPN") access to the Xceligent database, so that the commercial real estate data collected by the REBO/MaxVal operations team is placed directly into the Xceligent database. For security reasons the work that is being done is occurring within Xceligent's information technology environment.

17. REBO/MaxVal is aware that CoStar is a competitor of Xceligent.

18. REBO/MaxVal knew that it was improper to use LoopNet, and other CoStar sites like CityFeet, and Showcase, in its work for Xceligent, and knew that it was wrong to copy content from those sites into Xceligent's database. Indeed, on multiple occasions the members of the operations team at MaxVal received an "Access Denied" message and were blocked by CoStar when attempting to use LoopNet and copy content on behalf of Xceligent. The

4

REBO/MaxVal researchers were therefore on notice that their access to LoopNet on behalf of Xceligent was not authorized.

19. From time to time Xceligent's instructions indicated that LoopNet and other CoStar sites should not be used by REBO/MaxVal to copy content. But in practice REBO/MaxVal accessed these sites frequently to copy content, and Xceligent knew it. In fact, particularly during training sessions, Xceligent directly instructed REBO/MaxVal, and REBO/MaxVal agreed, to copy content from CoStar sites such as LoopNet, ShowCase and CityFeet directly into Xceligent's system, and to prioritize copying from ShowCase and LoopNet.

20. For example, on multiple occasions, particularly during training, Xceligent's Frank Bandelow, an upper-level manager, directed Mr. Khan to copy content from those CoStar sites into Xceligent's database, and Mr. Khan then shared those instructions with the REBO/MaxVal operations team working for Xceligent. The instructions were issued and followed whether or not anyone else, like a real estate broker, had the same content available on its website. In short, Xceligent management directed and encouraged free-riding off its competitor's (CoStar's) products.

21. Xceligent management set up a VPN connection for the REBO/MaxVal team to use specifically to access LoopNet in order to circumvent the website block implemented by CoStar, and the REBO/MaxVal team agreed to make use of it. The VPN connection was put in place so that a team of approximately 80 REBO/MaxVal researchers could access LoopNet without being caught by CoStar. When the VPN was not working, Xceligent directed the REBO/MaxVal team to use other means such as proxy servers, a tool commonly used by hackers, to circumvent CoStar's blocking technology.

22. Nate Lipowicz, Xceligent's Chief Research Officer, was primarily responsible for the VPN solution, and directed REBO/MaxVal that it should be used by the MaxVal researchers specifically to access LoopNet, bypassing CoStar's security measures. REBO/MaxVal researchers used the VPN solution on numerous occasions to obtain unauthorized access to LoopNet when CoStar took steps to block REBO/MaxVal from LoopNet.

23. The REBO/MaxVal operations team used the VPN provided by Xceligent to access Xceligent databases and servers. The VPN was also used by the MaxVal researchers, at Xceligent's direction, to access CoStar's Showcase site when MaxVal was blocked from Showcase. MaxVal used the VPN to access LoopNet and ShowCase in order to copy content for Xceligent when that content was unavailable from other sources, such as real estate brokers.

24. The content copied by the MaxVal team and uploaded into Xceligent's database included flyers and brochures that contain photographs of commercial real estate. Xceligent did not instruct the MaxVal team to determine whether the photographs were copyrighted, or to determine whether the copying was authorized by anyone, whether CoStar or a broker. To the contrary, Xceligent simply instructed the MaxVal team to copy flyers and brochures and upload them into Xceligent's database, even if the source was a CoStar website such as LoopNet. At the time, MaxVal employees knew, based on industry knowledge and discussions with Xceligent management, that CoStar-copyrighted photographs frequently appeared in such flyers and brochures. Indeed, it is widely known in the industry that even photographs in such brochures and flyers that do not contain the CoStar logo or watermark may be CoStar-copyrighted, because CoStar supplies copyrighted photographs to the brokerage industry, and brokers sometimes crop out the CoStar logo or watermark. Nevertheless, Xceligent directed the MaxVal team to copy this content anyway, and the MaxVal team agreed to do so. Accordingly, MaxVal employees

6

frequently uploaded CoStar-copyrighted photographs contained in brochures and flyers into Xceligent's database and both MaxVal and Xceligent knew that they were doing so.

25. To summarize, as a matter of practice, and with Xceligent's knowledge and at Xceligent's direction, the REBO/MaxVal operations team used measures to circumvent CoStar's security measures and thereby hack into CoStar sites in order to populate the Xceligent databases with content copied from CoStar. This practice occurred after the REBO/MaxVal team had been repeatedly denied access to LoopNet, a fact that was known to Xceligent. In order to access the CoStar sites, the REBO/MaxVal team used circumvention technology provided by Xceligent. And the practice of copying CoStar content involved the use of LoopNet accounts created by the REBO/MaxVal team, including Tanvir Khan, the Xceligent project manager.

26. Such copying of a competitor's content is a form of internet piracy. In addition, barraging a competitor's websites with unauthorized requests for information damages the security of their computers and servers, as well as their ability to analyze legitimate website traffic. Furthermore, using a competitor's content to compete directly with them is wrong and runs afoul of business's rules of fair play. But that is exactly what Xceligent was directing REBO/MaxVal to do. And, regrettably, that is exactly what REBO/MaxVal in fact did at Xceligent's behest, pursuant to an agreement with Xceligent.

27. REBO does not claim any common interest or joint defense privilege or other immunity from discovery regarding its communications with Xceligent about the subpoena, this lawsuit, or the lawsuit pending in the Western District of Missouri referenced above. REBO hereby irrevocably waives any such claim of privilege or immunity from discovery it previously asserted.

Plaintiffs and Defendant acknowledge they have read this Stipulation and have had it explained to them by counsel of their choosing, and fully understand it and agree to be bound thereby, and will not deny its truth or accuracy.

Dated: October 18, 2017

Respectfully submitted,

By: _____

Anthony Cillo (Pennsylvania Bar # 39687)
COHEN & GRIGSBY PC
625 Liberty Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 297-4974
Facsimile: (412) 209-0672
acillo@cohenlaw.com

Nicholas J. Boyle (*pro hac vice* application forthcoming)
C. Bryan Wilson (*pro hac vice* application forthcoming)
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
nboyle@wc.com
bwilson@wc.com

*Attorneys for Plaintiffs CoStar Group, Inc., and CoStar Realty Information, Inc.*

By: _____

Shaheen Z. Wallace
The Law Office of Shaheen Wallace
607 College Ave, Suite 2F
Pittsburgh, PA 15232
Telephone: (412) 345-1164
Facsimile: (888) 659-2741
szw@szwallacelaw.com

*Attorney for RE BackOffice, Inc.*

9

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COSTAR GROUP, INC. AND COSTAR REALTY INFORMATION, INC., | Civil Action No. |
| Plaintiffs, | **Electronically Filed** |
| v. | |
| RE BACKOFFICE, INC., | |
| Defendant. | |

### [PROPOSED] JUDGMENT AND PERMANENT INJUNCTION

Pursuant to the stipulation of Plaintiffs CoStar Group, Inc. ("CoStar Group") and CoStar Realty Information, Inc., ("CoStar Realty," and together with CoStar Group, "CoStar") and Defendant RE BackOffice, Inc. ("REBO"), this Court hereby ORDERS that final judgment shall be and is hereby entered in this action, pursuant to Federal Rule of Civil Procedure 58(a), as follows:

1. Judgment is hereby entered in favor of CoStar and against REBO on CoStar Realty's claims of contributory copyright infringement and vicarious copyright infringement, and CoStar's claims of conspiracy to violate the Computer Fraud and Abuse Act and civil conspiracy to engage in unfair competition.

2. Judgment is entered in CoStar's favor in an amount equal to 100% of the profits earned by REBO under its contract(s) with Xceligent, Inc.

3. The payment required by the preceding paragraph and the injunctive relief provided herein redress only acts, omissions, and injuries that are attributable to REBO alone; the payment and injunctive relief do not redress acts, omissions, or injuries that are attributable to any other entity. Nothing in this Judgment shall diminish either REBO or CoStar's causes of action, claims, or rights with respect non-parties to this action, including without limitation

CoStar's right to bring or pursue the same, similar, or related claims or causes of action asserted in this action (including without limitation claims for direct copyright infringement) against, and/or to recover damages from, any of the non-party entities referenced in the Complaint in this action.

## PERMANENT INJUNCTION

Pursuant to the stipulation of CoStar and REBO, and for good cause shown, this Court hereby ORDERS that a Permanent Injunction is entered as follows:

1. For the purposes of this Permanent Injunction, the following definitions shall apply:

    a. "Circumvention Measures" means any method of circumventing CoStar's abuse monitor or blocking software including without limitation virtual private networks, proxies, anonymizers, and/or TOR browsers.

    b. "CoStar" means CoStar Group, Inc., and CoStar Realty Information, Inc., and all and any parent, subsidiary, sister company, affiliate, related entity, assignee, transferee, designee, alter ego, or successor in interest.

    c. "CoStar Content" means both CoStar Photograph(s) and CoStar Data.

    d. "CoStar Data" means any and all property listing information or data, whether now in existence or later created, which (i) is displayed on any CoStar Website or any other website operated by CoStar now or in the future; and (ii) REBO obtained from CoStar, whether directly from CoStar or indirectly through a third party (or through a chain of third parties) which originally obtained the information or data from CoStar and which does not have CoStar's written authorization to distribute the information or data.

e. "CoStar Photograph(s)" means any and all copyrighted images (or portions thereof), whether in the form of a photograph, video, or other non-textual format, and whether now in existence or later created, in which Plaintiffs (including their parents, subsidiaries, or affiliates) own or control an exclusive right under Section 106 of the United States Copyright Act (17 U.S.C. § 106).

f. "CoStar Website" means any website owned or operated by CoStar, including loopnet.com, costar.com, showcase.com, cityfeet.com, apartments.com, apartmentfinder.com, apartmenthomeliving.com, bizbuysell.com, landsofamerica.com, landandfarm.com, shopproperty.co.uk, bizquest.com, and webpages within those domains. For the avoidance of doubt, the defined term CoStar Websites does not include websites owned or operated by third parties, including without limitation commercial real estate brokers.

g. "REBO" means RE BackOffice, Inc., and all and any parent, subsidiary, or affiliate (including without limitation MaxVal Technologies, Pvt., Ltd. and its affiliates in the course of work performed for, under contract with, or at the direction of RE BackOffice, Inc. ("MaxVal")), and includes all REBO Employees.

h. "REBO Employee" means any individual who acts or purports to act on behalf of REBO, including any MaxVal employee working on behalf of REBO.

2. REBO shall be permanently restrained and enjoined from (a) infringing by any means, directly or indirectly, any exclusive rights under the Copyright Act in CoStar Photographs, (b) accessing CoStar Websites for the purposes of competitive use, including without limitation for the purposes of copying CoStar Data, (c) employing Circumvention Measures to bypass CoStar's abuse monitor and/or blocking software for competitive purposes,

(d) publishing CoStar Content on its own websites or any other third party website, or (e) providing CoStar Content to any other person or entity for competitive use.

3.   If REBO is found to have violated the terms of this Judgment and Permanent Injunction by infringing a CoStar Photograph, copying CoStar Data relating to a real estate listing, or accessing a CoStar Website for competitive purposes, REBO shall pay CoStar the amount of $20,000 per infringing photograph per day of infringement, and $20,000 per real estate listing. This relief is non-exclusive and shall be in addition to any other relief ordered by the Court.

4.   This Court shall retain jurisdiction of this matter in law and equity for purposes of enforcing and/or adjudicating claims of violations of this Judgment and Permanent Injunction. Any such matters shall be raised by motion. The parties irrevocably and fully waive and relinquish any argument that venue in or jurisdiction by the Court is improper or inconvenient.

5.   The parties irrevocably and fully waive any and all right to appeal the Judgment and Permanent Injunction, to have it vacated or set aside, to seek or obtain a new trial thereon, or otherwise to attack in any way, directly or collaterally, its validity or enforceability.

6.   REBO shall give notice of this Judgment and Permanent Injunction to each of its officers, directors, agents, servants, employees, assigns, owners, alter egos, affiliates, all entities through which it conducts business, representatives, successors, licensees, and all those acting in concert or participation with each or any of them, to the extent such persons exist, and request adherence to the terms of this Permanent Injunction.

**IT IS SO ORDERED.**

5

_____                              _____

Date                                                                                   Judge _____

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of October, 2017, the foregoing Joint Stipulation for Entry of [Proposed] Judgment and Permanent Injunction was filed electronically. Notice of this filing will be sent to the parties by operation of the Court's electronic filing system, and the parties may access this filing through the Court's system.

*/s/ Anthony Cillo*